W. Willard WIRTZ, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

CHARLESTON COCA–COLA BOTTLING COMPANY, Incorporated, Vendors Unlimited, Incorporated, Fountain Products of Charleston, Incorporated and G. Simms McDowell, Jr., Defendants.

Civ. A. No. 8260.

United States District Court
E. D. South Carolina,
Charleston Division.

Jan. 25, 1965.

858

Charles Donahue, Sol., Beverley R. Worrell, Regional Attorney, William Fauver, Birmingham, Ala., for plaintiff.

T. E. Pedersen, Robert M. Hollings, Charleston, S. C., for defendants.

HEMPHILL, Chief Judge.

Plaintiff brings action for judgment enjoining and restraining defendants, their agents, servants and authorized connected personnel from violating the terms and provisions of § 15(a) (2) of the Fair Labor Standards Act of 1938, as amended.[1] Heard by the Court without a jury, testimony was taken, stipulations presented, and argument had on the following issues:

(1) Charleston Coca-Cola Bottling Company (hereinafter called "Bottling Company") and Vendors Unlimited (hereinafter called "Vendors") being admittedly an "enterprise," should Fountain Products of Charleston (hereinafter called "Fountain") be included as part of the "enterprise." [2]

[1] 29 U.S.C. § 215(a) (2).

[2] 29 U.S.C. §§ 203(r) and (s) (1) provide as follows:

Section 203(r) " 'Enterprise' means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units including departments of an establishment operated through leasing arrangements, but shall not include the related activities performed for such enterprise by an independent contractor: *Provided*, That, within the meaning of this subsection, a retail or service establishment which is under independent ownership shall not be deemed to be so operated or controlled as to be other than a separate and distinct enterprise by reason of any arrangement, which includes, but is not necessarily limited to, an agreement, (1) that it will sell, or sell only, certain goods specified by a particular manufacturer, distributor, or advertiser, or (2) that it will join with other such establishments in the same industry for the purpose of collective purchasing, or (3) that it will have the exclusive right to sell the goods or use the brand name of a manufacturer, distributor, or advertiser within a specified area, or by reason of the fact that it occupies premises leased to it by a person who also leases premises to other retail or service establishments."

Section 203(s) " 'Enterprise engaged in commerce or in the production of goods for commerce' means any of the following in the activities of which employees are so engaged, including employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce by any person:

"(1) any such enterprise which has one or more retail or service establishments if the annual gross volume of sales of such enterprise is not less than $1,000,000, exclusive of excise taxes at the retail level which are

(2) For the purpose of determining the coverage of employees of the admitted enterprise, should the tax collected by the enterprise on crowns [3] (the stoppers or bottle caps) be included in the "annual gross volume of sales" of such enterprise?

(3) Are those employees who ride the sale and delivery trucks along with the driver exempt from the provisions of Sections 206 and 207 of the Fair Labor Standards Act under the provisions of Section 213(a) (1) of the Act?

(4) Providing a violation of the Act is found, should an injunction issue?

The parties have stipulated most of the facts necessary for a decision. It appears that Charleston Coca-Cola Bottling Company, Inc. (hereinafter called the "Bottling Company"), was incorporated under the laws of the State of South Carolina in 1905, and owns a main office, bottling plant, warehouse and adjoining buildings located at 823 Meeting Street, Charleston, South Carolina. The officers and principal stockholders of record of the Bottling Company are as follows:

| Name | Position | Percentage of Stock owned |
|---|---|---|
| G. Simms McDowell, Jr., | Pres. & Gen. Mgr. | 28¾ |
| Frances M. Leitner | Secretary | 20½ |
| Martha Metcalfe Brooks | | 12 |
| Estate of G. J. McDowell | | 10 |
| Augusta McDowell Ball | | 7 |
| Eleanor W. McDowell | | 8 |
| Robert H. McDowell | Treasurer | 2¾ |
| Robert A. Daniel | Asst. Gen. Mgr. | |

The above stockholders bear the following relationship to G. Simms McDowell, Jr.:

Frances M. Leitner (cousin);
Martha Metcalfe Brooks (cousin);
G. J. McDowell, deceased (uncle);
Augusta McDowell Ball (cousin);
Eleanor W. McDowell (cousin);
Robert H. McDowell (cousin).

The Bottling Company has been the franchised bottler and distributor of Coca-Cola beverages in the coastal area of South Carolina since 1902, under a franchise, which is outlined below. It processes, bottles and sells Coca-Cola and related beverages (1) in bulk sales to retail stores and private organizations and (2) in coin-operated machines which it owns, leases or sells to establishments at which the machines are located. It regularly orders and receives syrups and other ingredients from out-of-state sources; such purchases for its own use were as follows: $401,810.89 in 1961; $412,641.85 in 1962; $452,562.24 in 1963; and $467,274.26 up to the time of the hearing in November 1964. The Bottling Company has a number of

separately stated and if such enterprise purchases or receives goods for resale that move or have moved across State lines (not in deliveries from the reselling establishment) which amount in total annual volume to $250,000 or more;
" * * * * * "

3. Section 65–762, S.C.Code, 1962, provides as follows: "Tax on bottled soft drinks.—Any soft drink offered for sale in a sealed bottle shall, within twenty-four hours of the time of its manufacture or receipt in this State, be stamped with a South Carolina soft drinks license tax stamp or a South Carolina tax paid crown at the rate of one cent for each twelve ounces or fractional part thereof by affixing such stamp or crown at such rate to each individual bottle."

sub-franchisers in South Carolina. None of said sub-franchisers is owned by The Bottling Company. The Bottling Company bills each sub-franchiser for syrup which the sub-franchiser receives from Atlanta, Georgia and in turn the Bottling Company makes payments to the Atlanta supplier for such syrup; the billing is accomplished as follows: the Atlanta firm bills the Bottling Company for shipments of syrup to sub-franchisers in South Carolina and the Bottling Company adds its royalties (due from the sub-franchisers) to the amounts it is billed and bills the sub-franchisers. The amounts of the Bottling Company's billings to its sub-franchisers were as follows: $273,394.64 in 1961; $287,479.40 in 1962; $310,776.15 in 1963. Independent of the foregoing sums, the total proceeds of sales of the Bottling Company were as follows: $937,195.93 in 1961; $1,025,733.53 in 1962; and $1,077,022.78 in 1963. The Bottling Company paid the following South Carolina crown taxes: $113,889.-67 in 1961; $120,981.28 in 1962; and $125,093.99 in 1963.

Vendors Unlimited, Inc. (hereinafter called "Vendors"), was incorporated under the laws of the State of South Carolina on December 22, 1961. One hundred percent of the stock of Vendors is owned by the Bottling Company. Vendors has the following officers:

| Name | Position | Percentage of stock owned |
|---|---|---|
| G. Simms McDowell, Jr. | President & Secretary | 60% |
| Robert A. Daniel | Vice President and Treasurer | 40% |

Vendors operates a warehouse and office in a building—owned by the Bottling Company—which adjoins the plant of the Bottling Company at 823 Meeting Street. Vendors is engaged in maintaining and operating numerous vending machines at which soft drinks, coffee and candies are dispensed. Vendors regularly purchases post-mix syrup from Fountain Products of Charleston, Inc. and has its vending machines maintained and repaired for compensation by and in the machine service department of the Bottling Company. The annual dollar volume of sales of Vendors was $229,954.56 in 1962; and $237,-490.09 in 1963. For approximately the first year of its existence Vendors purchased pre-mix coke from the Bottling Company.

It is stipulated that Vendors and the Bottling Company together comprise an "enterprise" within the meaning of Section 3(r) of the Act. Plaintiff contends that the three corporate defendants constitute an enterprise under said section and the Bottling Company in itself constitutes an enterprise thereunder.

Fountain Products of Charleston, Inc. (hereinafter called "Fountain"), was incorporated under the laws of the State of South Carolina on January 13, 1962. The officers and stockholders of record of this corporation are as follows:

| Name | Position | Percentage of stock owned |
|---|---|---|
| G. Simms McDowell, Jr. | President & Secretary | 60% |
| Robert A. Daniel | Vice President and Treasurer | 40% |

Fountain, which operates on premises owned by the Bottling Company at 823 Meeting Street, Charleston, S. C., is engaged in the wholesale distribution of syrups, cups, glasses and other fountain products. Over 90% of its total sales have regularly been sales of syrup for resale in fountains. Its annual dollar volume of sales was $104,325.46 in 1962; $147,696.70 in 1963. It paid S. C. gallonage taxes of $16,769.12 in 1962 and $31,339.13 in 1963 in accordance with § 65–754, S.C.Code, 1962.

The operations of the Bottling Company were first investigated by the Wage and Hour Division of the Department of Labor in March, 1961, at which time the Labor Department advised the employer that the investigation disclosed $52,000 in underpayments to its employees as a result of the failure to pay the minimum wage and overtime compensation due employees engaged in commerce or in the production of goods for commerce. The Bottling Company denied coverage but contended that if there was coverage the back wages were approximately $20,000, and not the figure reported by the Department of Labor. Negotiations for the payment of back wages were conducted for the period from March 1961, until January 1962, and concluded in the employer's refusal to pay the back wages in either said amount. During the course of such negotiations, in August 1961, the employer was advised by the Labor Department that an enterprise basis of coverage had been added to the Fair Labor Standards Act and that such coverage would take effect on September 3, 1961, the effective date of the Fair Labor Standards Amendments of 1961.

The next investigation, which gave rise to this suit, was conducted in May 1963, and disclosed that the Bottling Company had not paid, and was not paying, enterprise coverage wages to route employees. The Company advised the Labor Department that it contended that such route employees were and are exempt as outside salesmen under Section 13(a) (1) of the Act. The investigation also disclosed that the Bottling Company had failed to pay various other employees enterprise wages until May 1962. Since the second investigation and at the present time the Bottling Company has continued to pay wages less than those specified in Sections 6(b) (1) and 7(a) (2) of the Act respecting route employees contended to be exempt as outside salesmen. Other employees have been paid in compliance with the Act since May 23, 1962.

Also in evidence is correspondence between McDowell and the Regional Director of the U. S. Department of Labor. The Court's attention was drawn to two letters in particular (concerning 49 employees about whom dispute as to coverage was resolved). McDowell's letter to the Director, dated June 14, 1961 read:

"It would be appreciated if you could furnish us with weekly computation sheets for each of the forty-nine (49) employees in question in order that we may verify the figures."

To which the Regional Director, under date of June 21, 1961 replied:

"We will be glad to furnish copies of these computations if it is possible that you will agree to pay employees the amounts which a verification reveals are due."

This is analogous to a mandate by a District Attorney that a Bill of Particulars would be furnished only if defendant agreed to plead guilty. Certainly such bureaucratic abuse of freedom is an affront to justice, for the fact that this is a Wage and Hour case in no wise lessens the necessity, the determination, that this Court must dispense justice and that neither Government nor private industry have preference.

The Bottling Company bottles, distributes and sells Coca-Cola and related beverages in bulk sale to retail stores and private organizations and to direct consumers in coin-operated machines, which it owns. It regularly orders and receives syrup and other ingredients from out of State. There is no question that its employees handling these out-of-

state ingredients are covered under the traditional coverage of the Act and are being paid in accordance therewith.

The material portion of the contract signed in 1902, in which the Coca-Cola Company of Atlanta is the party of the first part and the Bottler, the party of the second part, reads as follows:

"FIRST: That party of the first part hereby gives and conveys to party of the second part the right that it received from THE COCA-COLA COMPANY, to use the trademark name COCA-COLA, and all labels and designs pertaining thereto, in connection with the product 'Bottled Coca-Cola' in the territory heretofore obtained by party of the second part from party of the first part, and party of the first part agrees not to convey, assign or transfer the right of usage of said name in said territory to any other party whatsoever; and said party of the first part agrees to obtain and furnish to party of the second part, and only to obtain, for the territory herein referred to, sufficient syrup for bottling purposes to meet the requirements of party of the second part in the territory now owned or controlled by party of the second part, provided party of the first part can obtain such syrup from The Coca-Cola Company. *Nothing herein, however,* shall give party of the second part any interest in the name COCA-COLA, labels, etc., except the right of usage in connection with Bottled Coca-Cola, nor shall this contract in any way interfere with the use of said name COCA-COLA, labels, etc., in connection with the fountain product of THE COCA-COLA COMPANY, *it being understood and agreed* that the use herewith given shall be confined to the bottled product; the name labels, etc., in connection with the fountain product having been reserved by THE COCA-COLA COMPANY.

"SECOND: Party of the first part does hereby select party of the second part as its sole and exclusive customer and licensee for the purpose of bottling and selling the Bottlers' Syrup COCA-COLA, in the territory heretofore acquired by said party of the second part.

"THIRD: Party of the first part does hereby give to party of the second part a license to use the distinctive Coca-Cola bottle adopted or to be adopted within the territory herein referred to, but said right shall end at such time as this contract is no longer in force or when it shall be terminated by the parties hereto or otherwise, provided, however, all conditions and terms of this contract are fully complied with by party of second part.

"FOURTH: In consideration of the above conveyance of the rights above described in Paragraphs One, Two and Three and further, in consideration of the consent of the party of the first part to the use of the name COCA-COLA as a part of the corporate name of party of the second part, and its further consent to the use by party of the second part of the trademark COCA-COLA on the product so sold, party of second part agrees:

"(a) Not to manufacture, deal in, sell, offer for sale, use or handle, nor attempt to do so, either directly or indirectly, any product that is a substitute for or an imitation of COCA-COLA, nor any product that can be used unfairly with COCA-COLA.

"(b) Not to sell Bottlers' COCA-COLA in syrup form, and not to bottle any Coca-Cola syrup that is made for fountain purposes.

"(c) To bottle COCA-COLA in the following manner: To have it thoroughly carbonated, put in bottles, using one once of Bottlers' Coca-Cola syrup in a standard Coca-Cola bottle, using a decorated crown stopper thereon, and to bottle it under such sanitary conditions as

shall be in compliance with any and all laws, whether State or National, and as shall conform with conditions necessary in placing on the market a food product.

"(d) To buy of or through said first party all COCA-COLA syrup required or used by second party in the preparation for market of its bottled goods aforesaid, and at * * [an agreed price] per gallon delivered at any point in the above mentioned territory, where a bottling plant is established by party of the second part, the purchase price for said syrup to accompany any and all orders for same; or if cash does not accompany said order, then party of the first part is to have the right to draw on party of the second part, with bill of lading attached. For every gallon of syrup so purchased and so long as this contract and all stipulations herein are fully complied with, party of the second part shall be allowed in advertising, ten cents (10 cents) per gallon; the advertising so allowed to be such as is carried by party of first part, or such as can be obtained by party of the first part from THE COCA-COLA COMPANY.

"(e) To invest in a plant and equipment, and to keep up said plant and equipment in such a condition as will be sufficient to meet satisfactorily the demands of the business in the territory now owned by party of the second part, and to increase such investment in said business as the demand for COCA-COLA in bottles in said territory may require.

"(f) To allow party of first part to enter upon and examine the premises, where said COCA-COLA is bottled and prepared for market, and to allow party of the first part, or its agents to make any necessary examination, to see that the provisions of this contract are carried out fully.

"(g) Not to use the name COCA-COLA, nor bottle nor vend said product except in the territory herein referred to. This limitation, however, is not to prevent party of the second part from obtaining such rights from parties authorized to use the name COCA-COLA, and to bottle and vend said product."

Title 29, Section 206(b) provides:

"(b) Every employer shall pay to each of his employees who in any workweek (i) is employed in an enterprise engaged in commerce or in the production of goods for commerce, as defined in section 203(s) (1), (2), or (4) of this title or by an establishment described in section 203(s) (3) or (5) of this title, and who, except for the enactment of the Fair Labor Standards Amendments of 1961, would not be within the purview of this section, or (ii) is brought within the purview of this section by the amendments made to section 213(a) of this title by the Fair Labor Standards Amendments of 1961, wages at rates—

"(1) not less than $1 an hour during the first three years from the effective date of such amendments; not less than $1.15 an hour during the fourth year from such date; and not less than the rate effective under paragraph (1) of subsection (a) of this section thereafter;

"*    *    *"

Title 29, Section 207(a) provides:

"(a) (1) Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce for a workweek longer than forty hours, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times

**864**

the regular rate at which he is employed; and

"(2) No employer shall employ any of his employees who in any workweek (i) is employed in an enterprise engaged in commerce or in the production of goods for commerce, as defined in section 203(s) (1) or (4) of this title, or by an establishment described in section 203(s) (3) of this title, and who, except for the enactment of the Fair Labor Standards Amendments of 1961, would not be within the purview of this subsection, or (ii) is brought within the purview of this subsection by the amendments made to section 213 of this title by the Fair Labor Standards Amendments of 1961—

"(A) for a workweek longer than forty-four hours during the third year from the effective date of the Fair Labor Standards Amendments of 1961,

"(B) for a workweek longer than forty-two hours during the fourth year from such date,

"(C) for a workweek longer than forty hours after the expiration of the fourth year from such date,.

unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

The issues revolve around these statutes.

In passing on the question of whether or not Fountain should be included in the "enterprise" admittedly existing between the other two defendants, the facts must be considered as they relate to the legislative will. The Congress has spoken in the Act itself and in the legislative history. Senate Report No. 145 (to accompany H. R. 3935) points out that the term "enterprise" is

"not necessarily coextensive with the entire business activities of an employer but means, subject to specified limitations, 'the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units, including dependents of an establishment operated through leasing arrangements.' It does not include the related activities performed for such enterprise by an independent contractor * * *.

"Related activities conducted by separate business entities will be considered a part of the same enterprise where they are joined either through unified operation or common control into a unified business system or economic unit to serve a common business purpose.

*    *    *    *    *    *

"The bill also contains provisions which should insure that a small local independent business, not in itself large enough to come within the new coverage, will not become subject to the act by being considered a part of a large enterprise with which it has business dealings.·

*    *    *    *    *    *

"The key in each case may be found in the answer to the question, 'who receives the profits, suffers the losses, sets the wages and working conditions of employees, or otherwise manages the business in those respects which are the common attributes of an independent businessman operating a business for profit?' "

1961 U.S. Code Congressional and Administrative News, pp. 1660, 1661.

It is readily apparent that the Bottling Company and Vendors constitute an enterprise; Vendors is a wholly owned subsidiary of the Bottling Company. It is also apparent that defendant Fountain Products, is not a subsidi-

ary of either, and though its place of business is at the bottling plant, it is an entirely separate company, organized for the sale and distribution of syrup, cups, glasses, and other fountain products, the sale and distribution of which are prohibited to the Bottling Company under the franchise.

Very often, with clairvoyant hindsight, one can determine causation and intention by the facts as they actually developed. Accordingly, the question could properly be asked: What was the real purpose for the formation of Fountain Products; was it to avoid coverage under the Act by forming a separate corporation to "run interference?" The answer to this question is answered in the interrogatories. Interrogatory 20 asks: "Does Fountain Products of Charleston, Incorporated, now sell products to any customers who prior to January 1962 bought the same type of products from Charleston Coca-Cola Bottling Company, Incorporated?" The answer given is "No."

Note further from Senate Report No. 145, supra, where it was stated:

"The bill's approach is to treat as separate enterprises those businesses which are unrelated to each other. For example, if a single company owns several retail apparel stores and is also engaged in the lumbering business, the sales of the lumbering business would not be included in the annual dollar volume in determining whether the $1 million test under section 3(s) (1) has been met. The emloyees of the lumbering business would not be included in the 'enterprise' even if the $1 million test were met since they are not engaged in the 'related activities' of the retail stores."

Id. at page 1660. It would seem that the undisputed answer to the interrogatory would be sufficient, in view of the above language, to take Fountain Products outside the purview of the Act.

In order to properly determine the question of "enterprise," the question involving the sub-franchises must also be looked into. As was noted, the Bottling Company has a number of sub-franchises within its territory, on whose purchases of syrup from Atlanta, the Bottling Company is paid a royalty. In practice, the subfranchisee orders its syrup direct from Atlanta and the syrup is shipped by Coca-Cola in Atlanta directly to the sub-franchisee. Atlanta invoices the Bottling Company, which adds its royalty to the invoice and sends the amended invoice to the sub-franchisee, who pays the Bottling Company, which in turn remits to Atlanta the amount received, less the royalty.

The issue as to whether these transactions are includable in the "Annual Gross Volume of Sales" within the meaning of Section 13(s) [4] of the Act or are "royalties" and are therefore not includable is significant only for the purpose of determining at what date after September 3, 1961 the Bottling Company became subject to the enterprise coverage of the Act. Enterprise Amendments to the Act were effective September 3, 1961, and the Bottling Company voluntarily complied with such coverage in May 1962.

On the issue of the includability in gross sales of syrup by Atlanta to sub-franchisees on which royalties to the defendant Bottling Company were paid, Plaintiff has failed to sustain the burden of proof that such "sales" were actual sales of the Bottling Company and therefore includable.

The basis for this reasoning is that it nowhere appears that the Congress intended to give an unrestricted meaning to the term "sales." For example, if the defendant Bottling Company, for some reason, owned stock in a steel mill, no one would contend that the dividends received therefrom would be included in the "sales" of the Bottling Company for purposes of this Act. By the same token, the only connection

4. See footnote 2, supra.

the Bottling Company has with the sale of syrup to sub-franchisees is that it adds its "royalty" to every gallon so sold. The Bottling Company does not set the price, has nothing to do with the orders (all negotiations and the like are made directly between the sub-franchisee and Atlanta Coca-Cola) and acts only as a "billing agent" which adds its royalty. This Court is not passing on the question of whether or not the amount received by the Bottling Company is a true royalty within the accepted definitions of the terms, see 77 C.J.S. pp. 542, 543, but this income is certainly not a "sale" such as to be included in the Bottling Company's "sales" for determining the question of whether or not it should be included in the Act. Though the term "sale" does not always have a fixed or invariable meaning, it is generally held to be "a contract between parties to give and to pass rights of property for money, which the buyer pays or promises to pay to the seller for the thing bought or sold." 77 C. J.S. Sales § 1. It is clear here that the buyer is the sub-franchisee, and the seller Atlanta Coca-Cola. The Bottling Company is neither one. Thus, in a very real sense, this "arrangement," as far as the Bottling Company is concerned, is *res inter alios acta,* a thing done between others.

▋ The issue of the includability in gross sales of the South Carolina excise or "crown" tax becomes considerably clearer when the statute involved is closely scrutinized. Section 65–762, S. C. Code, 1962, which is also quoted in footnote 3, supra, states that:

"Any soft drink offered for sale in a sealed bottle shall, within twenty-four hours of the time of its manufacture or receipt in this State, be stamped with a South Carolina soft drinks license tax stamp or a South Carolina tax paid crown at the rate of one cent for each twelve ounces or fractional part thereof by affixing such stamp or crown at such rate to each individual bottle."

If a stamp that is "affixed" is not separately stated,[5] what then is? The Court finds that said tax is required by law to be separately stated on each bottle and that portion of the proceeds from sales so collected and remitted to the State of South Carolina would therefore be excluded from the gross volume of sales under Section 3(s) of the Act, 29 U.S.C. § 203(s).

A review of the gross sales figures of all three corporations, excluding drop-shipment sales and excise ("crown") taxes, do not show that the defendants, even with Fountain Products' gross sales included, had reason to believe that their gross sales would exceed One Million Dollars prior to May 1962. Since that time all employees of all defendants, with the exception of certain route employees, have been paid in compliance with the Act.

▋ Defendant Bottling Company contends that the route employees are junior salesmen and are as such exempt from the provisions of the Act as "outside salesmen" under Section 13(a) (1). The Bottling Company distributes and sells its bottled beverage by the employment of salesmen who are allotted specific routes in the Charleston Area. The Bottling Company provides a truck which is manned by two men dressed in Coca-Cola uniforms; both attend sales meetings, both are trained in sales techniques, and both are knowledgeable as to the products, prices and duties encumbent upon them. They are characterized by the Bottling Company as "driver-salesmen" and "junior salesmen." Both are paid a guaranteed salary, plus a commission on the sales made by both. The "driver-salesman" is given the responsibility of the truck and the accountability for all moneys collected, and for this added responsibility is paid more in guaranteed salary and commissions. The evidence shows that the only time spent by these employees

---

5. Note the excludability of such separately stated tax in 29 U.S.C. § 203(s) (1) for purposes of ascertaining the annual gross volume.

at the Bottling Plant is for the purpose of attending sales meetings and loading and unloading at the beginning and end of each day's work. They are, therefore, customarily and regularly engaged away from the Bottling Company. There is no showing that any of their work is that performed by non-exempt employees of the Bottling Company.

The plaintiff urges the contention that the "junior-salesmen" were helpers employed solely for the purpose of assisting the "driver-salesman" in transporting goods and not directly concerned with effectuating the sale. The evidence adduced at the trial clearly shows that they were employed for a much broader purpose and that while there was some variation in the division of duties as between individual sales teams, each "junior-salesman" did make sales, though not as many as the "driver-salesman", that the sales of each were regarded as the sales of both, and that they both were compensated on this basis.

Accordingly, the sales made by the "driver-salesman" and the "junior-salesman" were joint sales and the work performed by the "junior-salesman" incidental to and in conjunction with sales were exempt under the regulations prescribed by the Secretary of Labor.

The last issue for determination is whether or not the existence of facts and circumstances regarding the Bottling Company's compliance with the Act require an injunction. Surely no injunction is called for here, because whatever difference of opinion exists between the Secretary of Labor and the defendants is based on beliefs generated by a reasonable interpretation of the Act.

The Bottling Company was first investigated by the Wage and Hour Division of the Department of Labor in March, 1961, at which time there were unresolved questions raised both as to the Bottling Company's liability for payment of back wages and the amount due assuming that liability for such payment existed under the Act. The evidence shows that the Bottling Company's position with regard to these disputed matters was reasonable, that no suit was instituted by the Secretary of Labor thereon, and that a succeeding investigation to be next discussed failed to disclose any violation on the basis alleged in the initial investigation.

The second investigation, which gave rise to this suit, was made in May 1963, and disclosed compliance by all defendants with all provisions of the Act except with respect to the "junior-salesmen" of the defendant Bottling Company and five employees of the defendant Bottling Company whose enterprise coverage from September 1961 to May 1962 was in dispute.

In view of this Court's findings of fact and conclusion that the defendants were not within the enterprise coverage provisions of the Act prior to May, 1962, and the finding that the junior-salesmen are exempt from the Act pursuant to Section 13(a) (1) thereof, it must necessarily be concluded that there is no evidence of any prior violation of the Act by the defendants or any one of them. Accordingly, there is no need for an injunction.

It is concluded that defendant Bottling Company and Vendors together constitute an enterprise having one or more retail establishments with gross sales since May 1962 of not less than One Million ($1,000,000.00) Dollars and are therefore an enterprise referred to and covered by Section 3(s) (1) of the Act. In view of this conclusion, Section 3(s) (3) of the Act is inapplicable.

Section 13(a) (1) of the Act as interpreted by the Secretary of Labor in Section 541.500 of his Regulations does not require as a prerequisite of exemption of an outside salesman from coverage of the Act that said salesman devote at least 80% of his time to "making sales." It provides that the hours of work of said outside salesman not include non-exempt work in an amount exceeding 20% of the normal work week of non-exempt employees. In defining non-exempt work, all work incidental to and in conjunction with an employee's

own outside sales are excluded by said Regulations. Thus, attendance at sales conferences, loading and unloading of sales-delivery trucks, travel time between sales stops, and all other work, provided it is incident to or in conjunction with the employee's own outside sales, are to be regarded as the equivalent of "making sales."

No violation of Section 15 by the defendants or any one of them having been proven, no cause has been shown by plaintiff for the issuance of an injunction under Section 17 of the Act.

And it is so ordered.